JOHN D. KILPATRICK ET AL. V. ANDREW J. RICHARDSON, JR.

FILED OCTOBER 4, 1893. No. 4683.

</div>

1. Trial: REVIEW: EVIDENCE: THE INSTRUCTIONS of the court should direct the attention of the jury only to facts in support of which evidence has been introduced upon the trial. When an instruction is not founded upon the evidence, and is calculated to mislead the jury in considering the facts of the case, the judgment must be reversed.

2. Negligence: EXPLOSIVES: PERSONAL INJURIES: EVIDENCE: INSTRUCTIONS. To sustain a verdict for damages on account of an injury suffered by reason of alleged negligence of the defendants, there must be evidence that such injury resulted from the negligence charged. Such causation cannot be left to the mere conjecture of the jury.

ERROR from the district court of Dawes county.    Tried below before KINKAID, J.

*Harwood, Ames & Kelly* and *Alfred Hazlett,* for plaintiffs in error.

*C. H. Bane, H. C. Brome* and *D. B. Jenckes, contra.*

RYAN, C.

On the 26th day of November, 1889, a petition was filed in the district court of Dawes county, Nebraska, on behalf of Andrew J. Richardson, Jr., an infant under the age of fourteen years, by his next friend, Andrew J. Richardson, Sr., against John D. Kilpatrick and others associated with him as partners under the firm name and style of Kilpatrick Bros. & Collins.    This petition alleged that the defendants began the construction of a tunnel in the said county of Dawes, previous to the injury complained of, and continued said construction until that time; and that while engaged in said work of construction, the said defendants negligently and knowingly caused and permitted a large number of exploders, which were of a dangerous character, to be left and scattered over the ground at and near the north end of said tunnel, and upon and adjacent to the right of way of the railway for the use of which said tunnel was being made at that point, where children and persons not acquainted with the dangerous character of said exploders, and not accustomed to the use thereof, were accustomed to pass and repass; and that the defendants, by their agents, servants, and employes, carelessly, negligently, and knowingly suffered and permitted said exploders to remain scattered over the surface of the ground at said point, exposed and unguarded, up to and including the 6th day of October, 1889, well knowing that children of tender years and childish instincts, without any knowledge or warning in reference to the great danger and peril to which they were ex-

posed, might take and handle said exploders. The petition further alleged that on the 6th day of October, 1889, while walking near the north entrance to said tunnel, the plaintiff discovered several of said exploders so carelessly, negligently, and knowingly left exposed and unguarded by the servants and agents of said defendants in the manner hereinbefore recited, and picked up one of them, not knowing what it was, and not knowing what it contained, and picked said exploder with a horseshoe nail, and without any warning or knowledge of the dangerous character of said exploder, and, without any fault on plaintiff's part whatever, said exploder so picked up by the plaintiff suddenly exploded in plaintiff's hands, and shattered and mangled, and completely tore off plaintiff's left hand so that it became necessary to amputate it to save his life; and shattered and tore off the thumb of plaintiff's other hand, and otherwise wounded plaintiff in the hand and face and permanently disabled him for life; and that as one direct result of said injury, plaintiff was for a long time, and still is, sick and disabled. There were allegations of suffering great pain and agony resulting from said injuries; of the expenditure of large sums of money made necessary thereby, and of the maiming, deforming, and incapacitating of plaintiff for the performance of any labor. The amount of damages was laid at $25,000, for which judgment was prayed.

The answer admitted the partnership as charged, and that during the year 1889 the defendants were engaged in the construction of a tunnel on the line of railroad running into and through Dawes county, Nebraska, and that in the construction of said tunnel the said defendants used and exploded dynamite in the removal of rock from said tunnel by the use of exploders; but alleged that if the plaintiff was injured, it was by reason of his own carelessness and negligence and through no fault of the defendants, and long after the defendants had finished their work on said

tunnel, and long after the same had been received and accepted by the said railroad company. Following these averments was a denial of each and every allegation of the petition except such as had been admitted to be true.

At the October, 1890, term of the district court of Dawes county a trial of the issues joined was had, which resulted in a verdict for the plaintiff in the sum of $5,000, upon which judgment was duly rendered. In due time proper proceedings were taken for the presentation in this court of errors alleged to have occurred on said trial.

The testimony discloses, as undisputed facts, that on Sunday, the 6th day of October, 1889, the lad who was injured, accompanied by his parents, his aunt, and one sister and perhaps another member of the family, went to the tunnel which had been constructed as alleged in the petition. The plaintiff, and the others who accompanied him, resided in Dawes county about twelve miles from the tunnel which they visited. Their object seems to have been simply to look at the tunnel as a matter of curiosity, and, perhaps, pleasantly employ the hours of that holiday. The boy who was injured was of the age of about eight years. Accompanied by his sister, aged about twelve years, he explored the surroundings of the tunnel, and finding several exploders, he and his sister brought them to the place where their mother and aunt were sitting. These exploders were about one and one-eighth inches in length, and from the testimony it would seem that they are from one-eighth to one-fourth of an inch in diameter and of a cylindrical shape. One end is closed and the other left open in the same manner as the shell of a cartridge for use in a rifle or pistol. Inside this exploder is placed for use some material which easily explodes, causing a report and jar which explodes the dynamite cartridge with which it is placed in contact. The boy having found a horseshoe nail, proceeded, with childish curiosity, to remove the contents of one of the exploders which he had found. This, as the boy in his

childish way said, caused the exploder to "blow off," and thereby the injury was inflicted of which complaint is made in the petition.

The first and most important question with which we are confronted is, where did the lad find the exploder which caused the injury of which he complains?  His own testimony was that he picked up a dynamite cartridge just a little ways from the tunnel; that he saw about fifteen other cartridges where he picked up this one; that they were lying around on the ground ; that he picked this particular one with a horseshoe nail he found at the tunnel, and that the cartridge blowed off and hurt him.   On his cross-examination this lad testified that he found the cap which exploded around the tunnel on the west side of the tunnel.

Maggie Richardson (Andrew's sister, of the age of twelve years at the time of the accident) testified that she saw some of the exploders before the accident.   She said, " We picked them up all around in the little building where they had been, where they had staid nights."   She further testified that she could not tell how many buildings there were, but there were lots of them around there; that they picked up no exploders anywhere else than in those buildings that she remembered of.   These buildings were just pine trees cut down and covered over with brush and stuff.   Some had doors, some had not.   All were open.   No one was in them.   They found the exploders lying on the floor or on a little stand or table among some gunnysacks that laid around.   This was on the hillside quite a way from the banks over the tunnel.

E. C. Simmons testified that when attracted by the explosion he went at once to the scene of the accident and found lying around there some other articles and a tin box in which are usually kept exploders, and saw some exploders; that the little girl said "he got them [the exploders] over there," waving her hand off towards the " Dago shacks," as they were called.   Mr. Simmons testi-

fied that one of these shacks was between him and the tunnel, and the rest were further west and further to the south from the tunnel. The little girl motioned to the south and west in a still further direction from where the boy was found. Between where the boy was injured and the road, along the top of the ridge through which the tunnel was made, the ground was bluffy except over the tunnel itself, where it was tolerably smooth. There were some rough buildings on the same side of the hill and a little west of where the boy was injured, commonly called "dug-outs." Some of these were made of poles leaned together at the top, and brush thrown over them, and some were made square with brush over the top and covered with sod. These, during the work, were occupied by Italians employed by defendants. The highest place the tunnel went through ran between the Kilpatrick buildings and the Dago huts, although the Dago huts were pretty well up towards the top on the north side. None of them could be seen from the Kilpatrick buildings.

. John Waldo, one of plaintiff's witnesses, in the district court, testified that the shanties or dug-outs were about fifty yards from the north end of the tunnel. Some of them were right above the tunnel.

Ben Hayden, another witness for plaintiff, testified that there were buildings that might be termed "shanties," or "dug-outs," some of them over the tunnel; that there was over a half dozen of these shanties which witness guessed the Dagoes had put there.

It would seem by this evidence clearly established, that the exploder which caused the injury to the boy was obtained by him in one of the shanties occupying the northern slope of the ridge through which the tunnel was built; and that the nearest of these shanties to the tunnel was distant therefrom fifty yards, up a steep and bluffy hill; the others within a radius of one hundred and fifty yards from the tunnel, measured over like ground.

John Waldo furthur testified that the powder house, in which were kept the exploders, was located still further south than the shanties—within about 150 yards of the south end of the tunnel. Other witnesses for the defendants in the district court testified as to the different distances, but no controversy existed as to this powder house being located south of the summit of the ridge and nearer the south end of the tunnel than the north end. This building was constructed of rough boards, and was in dimensions twelve by fourteen feet, and was provided with a lock and key to secure the door. There is no conflict in the evidence as to the completion of the tunnel August 28, 1889, and there is uncontradicted evidence that under orders of plaintiffs in error, there was removed from their buildings about the tunnel everything except some scrapers and other like personal property, which were left at the blacksmith shop. The witness who superintended this removal testified that he removed everything, but the above property is shown afterwards to have been removed by another person, and there is evidence that subsequent to the removal there were found some exploders in the powder house. The witness who found these exploders, however, testified that when he found them the lock of the powder house had been pulled out, and that the door was propped shut with a board. The custodian of this powder house testified that the staple was pulled out so that the door could be opened, and that two days before the removal of the contents, finding that the door had been opened, he nailed a board across it and fastened it shut. There was no evidence whatever that the explosives found in the powder house after September 10 were left there intentionally, neither was there to the contrary. It appears, after the removal of the contents of the powder house, as testified to by the custodian, that the board which had been nailed across the door was again removed, by whom or for what purpose no one could tell. There was abundant undisputed evidence that

50

between the completion of the work and the occurrence of the accident there were no exploders in the tunnel. The shanties in which the exploders were found by the children on the date of the accident were situate a distance of from 50 to 150 yards from the tunnel, a bluffy hillside intervening. The evidence showed that these shanties were built by the Italians who lodged in them. They were apart from the buildings erected by Messrs. Kilpatrick & Collins, and so far the testimony shows, these gentlemen were neither responsible for their erection, use, or existence.

There was a great deal of evidence directed to showing the manner in which the exploders were used during the progress of the work previous to August 28, the date of its completion. There was testimony on behalf of the defendants that the exploders were never attached to the fuse outside of a little house erected for that purpose, unless in very exceptional cases of hurry, while the contrary was testified to by the witnesses of the other party litigant. On the part of the plaintiff in the district court, there was evidence that at times exploders were, during the progress of the work, kept in unnecessary numbers of from one to one hundred, and there was also evidence that on different occasions these exploders were permitted to lie near the work on the ground. There was, however, no proof that the alleged careless manner in which the exploders were brought to, used, and permitted to lie promiscuously about in the tunnel, caused the injury complained of. It seems to be assumed, however, that this negligent use of these dangerous agencies, if established by proof, would justify the inference that such use was the direct cause of the accident; and the plaintiffs in error contend that the court, by the instruction to which reference will now be made, presented to the jury a state of facts materially different from any such as the evidence showed to exist.

After saying to the jury, in effect, that if they found that defendants were engaged in making a tunnel which re-

Kilpatrick v. Richardson.

quired the use of exploders dangerous to children not ac-
customed to them, the court continued the instruction com-
plained of in this language: "and that defendants, while so
using such exploders by their servants, agents, or employes,
caused or permitted said exploders to be scattered and left
on the surface of the ground in or near said tunnel, or on
the floor of unlocked or open buildings in the vicinity of
said tunnel, or left or permitted said exploders to be left
where persons other than the servants, agents, or employes
of defendants might take the same, and scatter them over
the surface of the ground or leave the same within said
open and unguarded buildings; and if you further find
from the evidence that children and all persons who
might desire to do so were in the habit or accustomed to
come at will with the knowledge and acquiescence of said
defendants, their agents and employes, into said tunnel and
upon and over the ground in the vicinity thereof and
around and about said unguarded buildings, then you will
determine whether or not such use and handling of said
explosives was a negligent and careless use of the same;
and if you do find such use and handling of said explo-
sives to have been a negligent and careless use thereof, and if
you further find from the evidence that exploders brought
to said tunnel by defendants were scattered over the sur-
face of the ground near said tunnel, or left in such build-
ings in either of the modes hereinbefore suggested, and
that said plaintiff was a child not of mature years, and not
acquainted with the dangerous character of said exploders,
or accustomed to the use thereof, and that plaintiff, on said
6th day of October, 1889, came upon the ground in the
vicinity of said tunnel and into and around such build-
ings, and while there picked up one of said exploders and
picked the same with a horseshoe nail, whereby the same
was exploded, and that plaintiff was injured by such ex-
plosion, and this without negligence on his part, then your
verdict in this case must be for plaintiff, and you will al-

low him such damages as the evidence shows he has sustained; and the fact that defendants had completed their work at said tunnel, and said work had been turned over to, and accepted by the railroad company for whom it was performed, would not prevent a recovery in this case."

The evidence has been carefully collated, and the facts have been stated as favorably as possible to the contentions of the defendant in error, that it might be determined, upon a careful comparison, whether a state of facts reasonably deducible from the evidence was correctly set forth in this instruction. Our conclusion is that the court erred in assuming that there was evidence showing that the exploder, to which this injury was due, was one left by plaintiffs in error in the tunnel, or that said exploder was found upon the floor of any building owned by the plaintiffs in error, or under their control, or that the plaintiffs in error were in any way responsible for said exploder being where it was found. It is possible that this explosive was taken from the powder house wherein it had been stored; or it may have been picked up by some one who carried it to the shanty where it was found. In either event the testimony should have shown that fact, and that plaintiffs in error were in some way responsible for its being placed where it was found, or had control of and were responsible for the condition of the shanty in which the boy unfortunately discovered it.

In *Meyer v. Midland P. R. Co.*, 2 Neb., on page 336, LAKE, J., thus quoted the modification made to an instruction: "This is the law: Unless the conductor or engineer in charge of the train, by the exercise of care and watchfulness, might have seen the child or children running directly towards the track so as to cross it, and from their size and conduct knew the child or children to be under the years of discretion, it was then the duty of those in charge of the train to check its speed, if possible, and put the same under such control, if practicable, as to be

able to avoid a collision with the children if they continued their course onto and across the railroad track."

On page 338 of the volume referred to, the opinion is continued in these words : " There was no testimony tending even to show that the child was seen ' running towards the track;' or that she was in a position where she could have been seen by the engineer one moment sooner than she was, as sworn to by him.    It is altogether probable, and it seems to be generally conceded, that she and her little brother were concealed in the small ditch which crossed the track at the place of the accident, and stepped out of it upon the track when the train was so near that, by the efforts which were put forth, it was not stopped until the engine had passed over them.   The tendency of this instruction was to mislead the jury and give them to understand that they were at liberty to resort to mere conjecture to enable them to account for what the testimony failed to show; and that they might infer the existence of a state of facts in respect to the relative position of the parties which the testimony would not warrant.    There was no evidence upon which to predicate this instruction.    The charge of the court to the jury should always be founded on, and be applicable to, the testimony; and when it is not, and is calculated to mislead the jury in considering the facts of the case, the judgment ought to be reversed. (*Meredith v. Kennard*, 1 Neb., 312, and cases there cited.)"

On page 339 of the same case, the following language was used: "It is the right of a party to a suit, by proper instructions, to have the minds of the jury directed to the essential features of the case, and their attention challenged to the testimony which should influence them in making up their verdict.   They should also be advised of the legal effect of the establishment of, or failure to establish, the material facts of the case.   When, however, this is not done, but, on the contrary, their minds are diverted from the real issues to be tried, and permitted to wander outside of the

testimony into the region of mere conjecture for .the pur-
pose of finding an excuse for returning a verdict in accord-
ance with their own sympathies and desires, the chief value
of a judicial trial is lost, and it is impossible to meas-
ure the injurious consequences that are likely to follow.
More especially is this so in a case like the one at bar,
where the jury had before them, as plaintiff against a
railroad company, a mere child, who by so terrible an ac-
cident had been so unfortunate as to be made a cripple for
life while perhaps endeavoring to rescue her little brother,
who was so shockingly crushed to death."

The principles recognized and laid down in that case are
the settled law in this state.  No amplification of ours
could render more clear the necessity for a strict adher-
ence to the facts proven in discussing in instructions, the
law as applicable to the facts which are in controversy be-
fore the jury.  These principles, applied to the facts in this
case and the instruction complained of, are decisive of this
proceeding, and the judgment of the district court is

REVERSED.

THE other commissioners concur.